[No. 29497. Department Two. May 22, 1945.]

R. P. GETTY *et al., Respondents,* v. JETT ROSS MINES, INC., *et al., Appellants.*[1]

*Harvey Erickson, Philip Tindall,* and *Houghton, Cluck & Coughlin,* for appellants.

*Geo. W. Young,* for respondents.

BEALS, C. J.—Plaintiffs, R. P. Getty and L. H. House, jointly purchased from defendant Jett Ross Mines, Inc., a corporation, a Northwest dragline shovel, a large machine used for excavating, for moving dirt or gravel, or as a crane.

[1] Reported in 159 P. (2d) 379.

Charles L. Ross at all times herein mentioned, was president of defendant corporation, which purchased the "dragline," as we shall call it, in 1935 for a sum between twelve and thirteen thousand dollars. When purchased, the machine was new with the exception of the base, which had been rebuilt at the factory.

During the summers of 1935-1936, the corporation used the dragline in placer mining operations in Wyoming, and in 1937 moved the machine to Idaho, where it was used in connection with the company's work on Quartz creek in western Idaho. In 1938 the machine was idle. During the year 1939, the machine was rented to a corporation in which Jett Ross Mines had a twenty per cent interest, the machine being again used in dredging operations and also as a crane. The dredging operations continued through 1939 and up to March 25, 1941, when, the ground having been worked through, the machine stood idle. The machine was in need of repair, and difficulties were experienced in obtaining needed parts. The dredge was placed in storage, where it remained about a year.

After negotiations and proceedings which will be hereinafter referred to, plaintiffs purchased the machine from Jett Ross for eight thousand dollars, of which three thousand dollars was paid in cash. The balance of five thousand dollars was payable one thousand dollars per month, together with interest at five per cent per annum. Thereafter, plaintiffs made three of the monthly payments, but, failing to make the last two payments, Jett Ross delivered to the sheriff of Spokane county, where the machine was then in storage, a notice by way of a short-form chattel mortgage foreclosure, pursuant to which the sheriff took possession of the dragline. Plaintiffs herein, then, by complaint filed, removed the proceeding to the superior court for trial.

By their amended complaint, plaintiffs alleged their purchase of the dragline; that it had been represented to them to be in good operable condition for use on a government project conducted by the H. K. Ferguson Company, which required that the dragline be in good running order; that plaintiffs relied upon the representations made by de-

fendant's officers that the dragline was in good operating condition; that these representations were false in that the dragline was not in good condition for service; all to plaintiffs' damage in the sum of $4,718.84, made up of the following items: Parts essential to repair, $1,585.84; labor in effecting repair, $823; loss of rental, 27 days at $30 per day, a total of $810; and $1,500, being the value of parts necessary to the machine which plaintiffs alleged defendant had agreed to deliver with the machine as part of the sale.

While the sheriff was named as a party defendant, he having possession of the dragline, we shall refer to Jett Ross as appellant.

Defendant filed its answer and cross-complaint alleging the sale of the dragline by defendant to plaintiff for eight thousand dollars, three thousand dollars cash, the balance as above stated. Defendant further alleged that plaintiffs had paid one thousand dollars, September 18, 1942, one thousand dollars, October 28, 1942, and one thousand dollars, January 14, 1943, asking for judgment for the balance, together with interest, and for foreclosure against the dragline. Defendant also asked for attorney's fees and costs.

Plaintiffs having replied with denials, the action was tried to the court and resulted in the entry of findings of fact and conclusions of law in plaintiffs' favor, followed by a judgment against defendant in the sum of $3,218.84, together with plaintiffs' costs. The judgment also quieted plaintiffs' title to the dragline, and adjudged that the defendant have a credit upon the judgment in the sum of two thousand dollars, together with interest thereon at the rate of five per cent per annum to the date of judgment upon the surrender by defendant to plaintiffs of the purchase note executed in defendant's favor by plaintiffs. From this judgment, defendant has appealed.

Appellant assigns error upon the denial of its motion to dismiss and for judgment upon its cross-complaint made at the close of respondents' case. Error is also assigned upon the entry of three findings of fact and the court's finding that respondents' agreement to purchase the dragline and pay therefor, as above set forth, was made in reliance upon

fraudulent representations chargeable to appellant, upon the making of the conclusions of law, and upon the refusal of the trial court to grant appellant judgment in accordance with the prayer of its cross-complaint. Appellant also assigns error upon the entry of judgment against appellant and upon that portion of the judgment providing for the credit to be allowed appellant in the sum of two thousand dollars above quoted.

The dragline was of considerable bulk, consisting of a tractor, platform, swing shaft, boom, revolving drums for the cables, a cable attached to the large bucket, and a gasoline power motor in a cabin sufficiently large to allow convenient operation by the engineer.

In the early spring of 1942, the machine was in storage, the motor having been torn down for the purpose of making necessary repairs. F. A. Rowe, called as a witness by respondents, testified that he was in the business of selling used and new machinery, having engaged in that business for thirty years. The witness testified that, during the spring of 1942, he was "selling and obtaining machines." Asked to state what he meant by "obtaining machines," the witness answered:

"Well, on these defense jobs contractors like H. K. Ferguson and Clifton, Applegate & George, and different contractors had these jobs, and they would want to rent a machine, and they asked me if I could find different machines. I found seven for Clifton out here on a job. Just obtaining them, and contacting the owner, and arranging the rental contract between the contractor and the owner."

Mr. Rowe testified that he noticed the machine and asked who owned it, as he was looking for a machine of that size and type. He asked Mr. Ross about the machine, and testified that Mr. Ross told him the machine was in A-1 condition with two exceptions, namely, the motor needed repair and the drive sprockets on the tractor were worn and in need of rebuilding. Asked if the machine was for sale, Mr. Ross answered that its price was eight thousand dollars net, to which the witness replied that that price was pretty high, "but owing to the conditions, the machines being in big demand, that they are bringing a bigger price."

The witness further testified that the general exterior appearance of the same was good, and that Mr. Ross stated that, when the repair work was completed, the machine would be in good condition. Rowe stated that he then conveyed the information to respondents, who met Mr. Ross and entered into negotiations which resulted in the sale. Respondents testified that Ross stated to them that the machine was in "good operable condition." They told Ross that they could rent the dragline to Ferguson Company for use on a war plant being constructed at Mead, Washington, informing Ross of the purpose for which the dragline was to be used.

The parties agreed upon the terms, a written contract was entered into, and three thousand dollars paid on account of the purchase price of eight thousand dollars. The contract bears date July 3, 1942, and is in form a promise to pay five thousand dollars, being the balance due on the purchase price after deducting the down payment. This amount was payable one thousand dollars August 20, 1942, and one thousand dollars on the 20th of each and every month thereafter, the last payment being due December 20, 1942.

One thousand dollars was paid September 18th, a similar amount October 28th, and the last payment of one thousand dollars was made January 14, 1943. Payments were credited first on interest due and the balance on the principal.

Mr. A. Dean Field was a most important witness on the trial of the action. His testimony indicates no bias in favor of either party. Mr. Field testified by deposition, having been called as a witness on behalf of appellant. He was examined and cross-examined at considerable length, and, on the trial, his deposition was published on motion of respondents and was read in evidence as a part of respondents' case, respondents' counsel stating that he would use Mr. Field as his witness.

Mr. Field testified that he was a machine shop manager, and his qualifications were admitted and vouched for by both parties to this action. The witness testified that on

behalf of a client he had examined approximately one hundred twenty-five machine shovels, of which his client had rented and purchased about fifty, all of which had been inspected and passed on by the witness.

After both respondents had examined the dragline, they consulted Mr. Field, who went with them to examine the machine. Respondent House testified that Mr. Field, in the presence of himself and Mr. Getty, examined the dragline for two hours or a little less. Mr. Field inspected the cab and with a bar tested the drums, bearings, and other parts, for the purpose of ascertaining how much future use remained in them. Mr. Field also examined the large main bearings underneath the platform. Mr. Field testified that he was on or about the machine about two hours; that with a bar he tested the drums, shafts, gears, etc.; that he tested the friction drums with a crowbar, finding that they were worn quite badly, "but not too bad for their operating condition as a dragline"; that the swing unit and hoist drums showed approximately fifty per cent wear in all bushings.

He stated that the motor was being welded, and that Mr. Ross told him

". . . that he was at least going to grind the valves, and gave me the impression that he was going to check the motor for rings, bearings, et cetera, while the motor was disassembled. The condition of the cylinders looked good.

"I did not see the finished weld on the head of the motor, so couldn't determine whether the weld would be satisfactory or not. The crankcase was not open at the time, therefore I could not notice the condition of the crankshaft or the wear on the pins or pistons.

"The track assembly was covered with mud to the extent that it was absolutely impossible to determine whether there was any wear of the support rollers, idlers or drive tumblers.

"The swing unit and the hoist drums showed approximately 50 per cent wear in all bushings. . . .

"A. The machine in general, with what Mr. Ross stated, as to what he was repairing on the engine, appeared to be in about 65 per cent operating condition. Q. You mean by that, that after Mr. Ross finished the work that he said he was going to do on the engine, it would be in about 65 per cent operating condition, in your opinion? A. If his weld-

ing job, repairing, would have held up on the motor, I would say it would be in 65 per cent operating condition. Q. Does that refer only to the motor, or to all working parts of the machine? A. That would be the whole machine. However, before the machine would be accepted, I would naturally operate it at some later date to determine actual wear and tear. Q. Did the work Mr. Ross was doing there on the machine, the repairs he was making at that time, or that he would have to make in order to get the machine back together again, have any connection with the swing-shaft? A. None whatsoever. Q. Did it have any connection with the clutch drive pinions? A. No. Q. With the boosters? A. No. Q. With the rollers? A. No. Q. Did Mr. Ross say that he expected to do any work on the machine other than finish repairing the motor? A. No. Q. Did Mr. Ross permit you to look at the machine— A. (interposing) May I say something there? Q. Yes. A. You must remember this, that Mr. Ross was more or less dealing with me directly at the time of the inspection. What I mean is not for the business deal, because that would have to go through Mr. Getty and Mr. House, but he owned the machine, and I was questioning him for my interest as to the condition of the machine. Now, what I mean by that, Mr. Ross placed in my mind the fact that he was just going to repair the heads of the motor and more or less check the motor over, and then I was to take the machine as is. Q. He didn't indicate his intention to do any work other than finish the work that he was doing on the motor?    . . .

"Q. After you left, did you discuss the condition of the machine with Mr. Getty and Mr. House? A. Yes, to the extent that I didn't wish to commit myself too strong, one way or another, because if I couldn't find another machine, I would come back and take this machine. But I did quote to one or both that I thought that the machine was in fairly good condition. Q. That you thought that it was in fairly good condition? A. Yes. However, I did state that if I didn't find anything further in my travels, that I would come back and would want to operate the machine before I made my final decision of acceptance. Q. Just to refresh your memory, didn't you tell me in a conversation a day or two ago, that you told Mr. Getty and Mr. House you thought the machine was not in very good condition? A. Well, I have had this in mind throughout our conversation, that the machine as a whole was in fairly good condition. Q. What do you mean, 'fairly good condition?' A. That the ma-

chine was in operating condition to the extent that after receiving the machine on any one of the Austin projects, if accepted as is, that minor repairs and adjustments would have to be made to balance the machine for crane operation."

Mr. Field's examination of the machine did not result in its purchase or lease by his principal, and Mr. Field did not again see the dragline.

Respondent Getty testified, referring to Mr. Field in his examination of the dragline:

"A. He may have had a small bar. It was crowded up there. The cab was small and he was in the cab, and I got down and stood right by the door watching him. The first thing he told me, he said, 'there is no use of us even stopping here.' For that matter, as long as we had gone ninety miles to see this, he figured on operating it and running the motor and operating the machine and trying it out, and if we had gone to work for him, we would have loaded it in the next day or two because he wanted the machine."

Referring to the witness Field and his examination of the dragline, respondent House testified:

"A. He said he needed the machine right away, the way I understood it. It wasn't ready to go, and he couldn't tell much about it. Q. Did you ask him his opinion as to its condition? A. Well, he said that, as Mr. Ross said, it was a pretty fair old machine, and able to go to work. Q. Mr. Field said he thought it was a pretty fair old machine? MR. YOUNG: Just a minute. That isn't what the witness said at all. (Last answer read.) MR. YOUNG: Probably that 'it' was 'if.' MR. HOUGHTON: I object to Counsel testifying for the witness. MR. YOUNG: I am attempting to straighten him out. MR. HOUGHTON: Well, I am not going to permit you to put words in the mouth of the witness. THE COURT: I am not quite clear myself as to whether Mr. Fields said it was a pretty fair machine, or asked whether Mr. Fields said Ross said it was? MR. HOUGHTON: Let's find out. (Q.) Did Mr. Fields say it was a pretty fair old machine, able to go to work, or did he say that Mr. Ross had said that? A. He said, the way I understood it, that what Mr. Ross said was, it was a pretty fair old machine."

Testimony on behalf of respondents indicated that, during the latter portion of the month of May, 1942, Ross stated to them that he had completed repairing the motor, and

that they informed Ross that the dragline would be used by a construction company in constructing a war plant at Mead, Washington. Early in July, respondents purchased the machine, which was transported to Mead. On attempting to operate the dragline, respondents' lessee discovered that it would not perform satisfactorily because of certain enumerated defects. Respondents replaced certain parts at a cost for material and labor as above set forth. It does not appear, however, that respondents then made any demands upon appellant, nor that they claimed that the dragline had been misrepresented as to its condition. Shortly before the date when the first deferred payment would fall due, respondent Getty called at the bank at Orofino where the note was to be paid and discussed the matter with the bank's manager, Mr. Jellinek. Getty testified that in the course of the conversation he made some protest concerning the condition of the dragline and asked that Mr. Ross be notified. The witness also testified that he talked to Mr. Ross at Seattle, but did not narrate the subject of conversation. He further stated:

"So, I went to Orofino and told Mr. Jellinek the condition it was in, and told him that we was unable to pay him at the date of the first payment, but, we had been assured they would take the machine back, the Ferguson Company, if we prepared it properly, they would use it, and, then, the rental would start coming in and at that time we would have money to make the payments. But, I protested to Mr. Jellinek about the repairs and told him to advise Mr. Ross, also."

He stated that later he saw Mr. Ross and asked him "to try and get an adjustment."

Under date of July 25, 1942, respondent House wrote Mr. Ross a letter, which was introduced in evidence, telling him that the dragline was in need of repair and listing the work which had been done. He stated that they were having difficulty in procuring some needed parts and that the machine would not be in working order until about August 5th. Continuing, he wrote:

"I wish you would extend this payment until we can get in thirty days with the machine. After they except it is up

to them to keep it in repairs. It was in need of a overhauling so we had to do it before they would except the machine. We can get close to a years work here and everything will go alright as soon as the machine is ready to go.

"Kindly let me know by return mail as to payment. It will work a hardship on us to dig this payment. Have paid out that much now on repairs and labor."

Mr. House made no suggestion of any claim against appellant, nor did he ask for any adjustment as to the purchase price. Mr. Ross did not answer this letter, but allowed the time requested to pass without demand for payment.

September 18, 1942, respondents made the first one-thousand-dollar payment, apparently without complaint.

Respondents made the second payment of one thousand dollars, October 28, 1942, without complaint as to the condition of the dragline. The third payment was not made when due, and after some correspondence between Mr. Schulte, vice-president of appellant corporation, and respondent Getty, which correspondence was not introduced in evidence, respondent Getty sent Mr. Schulte the following telegram dated at Spokane, January 9, 1943:

"HAVE NOT RECEIVED GOVERNMENT CHECKS FOR RENT WHICH ARE PAST DUE AM HERE TRYING TO HURRY THEM THROUGH THEY ARE VERY SLOW SEND PAYMENTS SOON"

Five days after sending this telegram, the third thousand-dollar payment due on the purchase price of the dragline was made.

This payment was made about five months after respondents had finished the work which they caused to be done on the dragline and after they had full and complete knowledge of the cost to them of the repairs.

The corporation which had leased the dragline from respondents terminated its rental agreement for the use thereof by letter to respondents dated January 4, 1943, several days before respondents made their last payment to appellant.

No further payments having been made by respondents after two or three months, Ross telephoned Getty at Spo-

kane, asking the cause of the delay. Several weeks later, Getty called on Ross at his home near Seattle, testifying that he went there to see Ross, "and asked him to try and get an adjustment." Getty did not testify that he then stated to Ross that the machine had been misrepresented.

Early in August, 1943, these respondents commenced an action against appellant, seeking damages upon the same facts alleged in their amended complaint herein. This action was later dismissed without prejudice.

Mr. Ross, called as a witness on behalf of appellant, testified at length concerning the transaction in question. It is admitted that Mr. Rowe happened to see the machine and asked who owned it, and then spoke to Mr. Ross with the thought in mind that he might acquire the dragline. Mr. Ross stated that the machine was for sale and that the price was eight thousand dollars net; but it does not appear that he made any special effort to find a purchaser other than to permit Mr. Rowe, Mr. Field, and respondents to inspect the machine. Apparently respondents sought Mr. Ross in connection with a prospective purchase. When Mr. Field examined the machine, it appears that he was permitted to make any investigation concerning its condition that he desired and that, under existing conditions, it was possible for him to make.

Mr. Field and respondents testified that Ross stated that, subject to repairs to the motor, the dragline was a fairly good machine, capable of operating two or three months without need for major repairs. During the month of May, Ross informed respondents that the repairs to the motor had been completed. Thereafter the dragline was in storage for over a month, so far as it appears, subject to examination by respondents. Mr. Ross had taken the motor down for the purpose of repairing it for his own use prior to the time Mr. Field and respondents saw the dragline. Mr. Field made it clear that, if he decided to use the machine, he would desire to place it in operation before making his final decision. When Mr. Field decided not to use the machine, naturally he did not attempt to operate it. Respond-

ents undoubtedly knew all that Mr. Field knew concerning the dragline.

Mr. Rowe testified that Ross said that the machine was in A-1 condition with two exceptions: The motor needed repair, and the drive sprockets were worn and needed rebuilding. Later he testified that Ross merely told him that the machine was "in good shape."

Respondent House testified that Mr. Ross said, "It was a pretty fair old machine." Mr. Field testified that Ross had said that he thought the dragline, used as a crane, "would work out pretty good."

The trial court in its memorandum opinion severely criticized Mr. Ross's testimony, saying that the witness was evasive, lacked candor, and sought to make it appear that he had not desired to dispose of the dragline. The trial court also stated in its memorandum opinion that Ross's testimony had lowered his credibility as a witness and lessened the weight of his testimony in respect to the matters at issue.

The trial court found that Mr. Ross, for the purpose of inducing respondents to purchase the dragline, as an officer of appellant corporation, had

". . . made representations to the effect that said shovel was in a first-class mechanical condition; that he was repairing the motor and checking the same for the purpose of placing it in good mechanical order. . . .

"That the representations as to the condition of said shovel were untrue. That said machine was . . . wholly defective by reason of worn, broken and bent parts for any purpose for which it was designed to be used and could not be used until extensive replacements of parts and repairs were made thereon."

That the true condition of the dragline could not have been discovered except by operation thereof. That it was impracticable for respondents to operate the machine, and that they had a right to rely upon the representations made by Ross.

It is true that Ross's testimony was sometimes argumentative, but, as we read it, it does not appear to deserve the severe criticisms of the trial court.

In our opinion, the important testimony concerning the condition of the dragline is that of Mr. Field, who testified (*supra*) that with the motor-welding job finished the machine as a whole would be in about sixty-five per cent operating condition.

Mr. Field's estimate of the condition of the dragline does not suggest that the used secondhand machine, seven years old, was in particularly good condition. He testified (*supra*) that he understood that Ross would repair the heads of the motor and "more or less check the motor over," and that then Ross would sell the machine "as is." It was evidently unsuitable for Mr. Field's purposes, whatever they were, as he manifested no further interest in acquiring the dragline.

When coupled with the undisputed evidence concerning the conduct of respondents after their purchase of the machine, the entire record convinces us that respondents received a machine in just about the condition they anticipated. They knew they were buying a secondhand dragline which had been much used. It clearly appears from the record that such machines were in great demand. Mr. Field testified that he had been instrumental in the lease or purchase of fifty.

That respondents knew many of the defects in the machine soon after they purchased it, clearly appears from the letter respondent House wrote to Mr. Ross, July 25th, but in that letter there is not the least suggestion that respondents thought they were entitled to any price adjustment. Evidently the only purpose in writing the letter was to procure an extension of time in making the first payment. The fact that Mr. Ross did not answer the letter is unimportant. The matter of a payment was allowed to remain in abeyance until September 18th, when respondents paid the money. They made the second payment October 28, 1942, without any suggestion that the machine had been misrepresented or that they had any claim whatever against appellant. The third payment was not made when due, and, after some correspondence which was not introduced in evidence, respondent Getty, January 9, 1943, sent to

Mr. Schulte, appellant's vice-president, the telegram above quoted. The third payment on the contract was made five days thereafter. This payment was made long after respondents had made the repairs on the machine which they contend were necessary and of which they complain, and still respondents did not intimate that they had been misled as to the condition of the dragline.

It was not until sometime after January, 1943, and after Mr. Ross had communicated with Mr. Getty inquiring about the fourth payment, that Mr. Getty saw Mr. Ross in Seattle and, as Mr. Getty testified, "asked him to try and get an adjustment."

Respondents argue that no estoppel operates against them in appellant's favor. We do not regard respondents' conduct as constituting an absolute estoppel *in pais*, but it is very persuasive evidence that respondents, for many months after they had purchased the dragline and were fully acquainted with its condition when purchased, did not believe that they had been induced to purchase the machine by reason of false representations as to its condition. It is also somewhat significant that they made no claim against appellant until after the dragline had been turned back to them by the construction company which had leased it.

A person defrauded by false representations which he was entitled to rely upon and upon which he did rely in making a contract may either bring an action for rescission or may affirm the contract and sue for damages. In this case, respondents chose the latter course.

The case of *Keylon v. Inch,* 178 Wash. 522, 35 P. (2d) 73, is of interest in connection with the question now under discussion. The plaintiffs were defrauded in connection with their purchase of a garage property. They delayed taking any action for a long time (much longer than in the case at bar) after they had knowledge of the fraud. In holding that the plaintiffs were properly denied judgment against defendants, this court cited several authorities which state principles which have some bearing upon the facts in the case at bar.

In the case of *Bonded Adjustment Co. v. Anderson,* 186

Wash. 226, 57 P. (2d) 1046, 106 A. L. R. 166, which was an action upon a promissory note, the defendants by cross-complaint brought in new parties, pleading fraud in the original transaction, which was the sale of a tractor. The defendants had paid some of the installments due on the notes and given new notes covering some of the payments which they did not pay in cash. In holding that the defendants had waived any rights to sue for damages, we cited the case of *Keylon v. Inch, supra,* and other authorities.

There is in the record a letter from the H. K. Ferguson Company, dated at Spokane, June 30, 1942, directed to respondents at Lewiston, Idaho, in which the writer agrees to rent the dragline. It was rented to the company referred to, and respondents claim damages for loss of rental in the sum of thirty dollars a day, which indicates that the rental value of the machine was considerable.

The misrepresentations of which respondents complain are somewhat indefinite. They call attention to Mr. Field's testimony, saying that Ross represented to respondents and to Mr. Field that the dragline was in good operable condition and the further fact that Mr. Field concluded (taking into consideration Ross's statements that he was repairing the motor) that the machine was a fairly good machine, capable of operating two or three months without need for major repairs. Mr. Field was an expert, amply qualified to examine and form an opinion as to the condition of the dragline. Both parties vouch for his qualifications. His attention had been drawn to the particular machine by respondents themselves. He testified that before he would form a final opinion of the machine he would wish to operate it.

While it does not appear that any agent of appellant ever suggested to respondents that they test the dragline by operating it, the record discloses no request by respondents that they be permitted to so test the machine. Apparently respondents never examined the dragline save as above set forth, though they had every opportunity to do so.

At least some of the statements made by Ross, and upon which respondents rely as warranties, fall within the

class of estimates or "seller's praise," and do not fall within the classification of statements upon which the buyer of a secondhand machine may rely without investigation.

Respondents knew, of course, that the dragline had been used and was definitely secondhand. Their attention had been called by Mr. Field to the fact that certain portions which he named were only fifty per cent efficient, and he estimated the machine as a whole (with the motor repaired) as no more than sixty-five per cent efficient. That was the machine for which respondents offered to pay two thirds, or a little less, of its cost new. Such machines were in great demand. This one was rented for over eight hundred dollars per month.

Many cases are cited (and the list could easily be greatly enlarged) in which courts have considered alleged statements concerning the condition of secondhand property for the purpose of determining whether or not such statements afforded an adequate legal basis for the recovery of damages based upon misrepresentation.

In the case of *Smith v. Bolster*, 70 Wash. 1, 125 Pac. 1022, this court reversed a judgment in favor of the purchaser of a secondhand automobile, holding that certain statements relied upon by the purchaser were not warranties. The defendant purchased from the plaintiff a secondhand automobile, which had been used by plaintiff for demonstrating purposes, for eighteen hundred dollars, five hundred dollars less than the cost of the car new. The purchaser contended that the seller had guaranteed that the car was " 'in first class condition, as good as any new car,' " and that it would average eleven miles to a gallon of gasoline. Concerning this statement, this court said:

"The fact that the price was fixed at over twenty-one per cent less than the price of a new car was of itself evidence that the car was to that extent of less value than a new car. To say that it was in first-class condition is nothing more than the expression of an opinion as to its then condition, or what the law sometimes terms 'seller's praise.' The same may be said of the statement that it would run eleven miles on a gallon of gasoline.

"*Morley v. Consolidated Mfg. Co.*, 196 Mass. 257, 81 N. E. 993, is a similar case. The car there referred to was a demonstrating car that had run about five hundred miles, and the statement relied upon was that the car 'was in good condition, first class condition.' It was held not to constitute a warranty, being 'mere seller's talk.' Similar expressions may be found in 28 Cyc. 44; *Warren v. Walter Auto Co.*, 99 N. Y. Supp. 396; *Clark v. Ralls*, 50 Iowa 275."

Reversing the judgment appealed from, the court said:

"We are of the opinion that there was neither warranty nor breach, and that the judgment of the lower court in so holding is error."

In the case of *Biel v. Tolsma*, 94 Wash. 104, 161 Pac. 1047, this court, on appeal from a judgment rendered upon the verdict of a jury in favor of the defendant in an action for fraud, approved, among other instructions, the following:

" '(4) You are instructed that when parties are negotiating a sale and purchase for property which there is an opportunity for examining, a party has a right to exalt the value of his own property to the highest point the purchaser's credulity will bear. Such boastful assertions and exaggerated descriptions do not amount to fraudulent misrepresentation or deceit. In such case, the parties are upon equal ground, and their own judgment must be their guide in coming to conclusions." [Citing 2 Cooley on Torts (3d ed.) 921.]

Respondents cite many authorities which they contend call for affirmance of the judgment in their favor.

In the case of *Glaspey v. Wool Growers Service Corp.*, 151 Wash. 683, 277 Pac. 70, the seller recovered damages on account of breach of warranties as to the condition of two flocks of ewes purchased for breeding purposes. The judgment in plaintiff's favor was affirmed, the seller having positively represented that the ewes were fit for breeding purposes and free from disease when in fact they were diseased and unfit for breeding purposes. The seller knew that the ewes were infected with scab, a disease which could not be recognized save by a person having special knowledge, which the seller knew that plaintiff did not possess. The case is not in point here.

Respondents strongly rely upon the case of *Marion Steam Shovel Co. v. Aukamp,* 172 Wash. 455, 20 P. (2d) 851, which they contend is on all fours with the case at bar. The plaintiff was a dealer in new and used power shovels, H. J. Balzer being its representative. The defendant, a contractor residing in Yakima, had contracted with the state to grade and surface a highway, the work requiring that about seventy-two thousand yards of material be moved. The defendant called on Balzer, who showed him a used shovel manufactured by the plaintiff. Balzer represented that the shovel had been completely disassembled and rebuilt, thoroughly overhauled, and that it would operate as well as a new machine. He made other representations as to the condition of the shovel and that it would handle one thousand cubic yards a day. The shovel had been newly painted, including the working parts, and presented the appearance of a new shovel. It was standing in a rather dark shed. In answer to a suggestion that one could not be sure as to the condition of such a machine without operating it, Balzer assured the defendant that the shovel had been thoroughly overhauled by the manufacturer. The defendant relied upon Balzer's representations, signed an executory contract for the purchase of the machine, and made a down payment. When the machine was put to work, it proved completely unsatisfactory. All attempts to make it operate ended in failure. The seller sued the purchaser for the unpaid purchase price, and, as here, the purchaser defended by cross-complaining for damages based on alleged false representations by Balzer. It appeared that only fifteen shovels of the type in question had been constructed, that they had proved unsatisfactory, and that all those sold had been taken back by the plaintiff. From a judgment in favor of the plaintiff for the balance due on the contract, the defendant appealed.

This court heard the case *de novo,* and reversed the judgment appealed from. On cross-examination, Balzer stated that he did not remember telling the defendant that the machine had been completely disassembled and rebuilt, admitting that if he had made that statement it was not true.

He thought that the machine had been overhauled, but his information went no further than that. It appeared that the shovel was incapable of doing the work for which it was sold with Balzer's knowledge, and that the latter had met a suggestion that the machine's ability could be ascertained only by operating it with an assurance that the shovel had been disassembled, rebuilt, and thoroughly overhauled.

In the case at bar, the dragline was shown in the open, under no camouflage whatsoever. Respondents and Mr. Field made every examination thereof that they could make. Respondents knew they were buying a secondhand dragline, and they made no attempt to examine it at any later date, although the purchase was not completed for many weeks after the examination by Mr. Field. Any statements made by Ross, according to the testimony introduced by respondents, fell far short of the representations made by Balzer in the case cited.

In the case of *Fairbanks Steam Shovel Co. v. Holt & Jeffery,* 79 Wash. 361, 140 Pac. 394, 1915B, L. R. A. 477, a recovery was allowed for a breach of warranty in connection with the sale of secondhand dredging machinery. The court held that a warranty by the seller to overhaul the machinery and put it in "first class shape" had been breached.

This case and the one just previously cited to some extent support respondents' position here, but we hold that they are distinguishable upon the facts and are not controlling.

Respondents cite the case of *Buob v. Feenaughty Machinery Co.,* 191 Wash. 477, 71 P. (2d) 559, as authority for their contention that they did not, as matter of law, waive their claim for damages by reason of their request for an extension of time within which to make the first payment due on their contract. We do not hold that respondents, as matter of law, waived any such right, as above stated, but we consider their course of conduct in connection with making the payments due upon the contract as very persuasive evidence that, after full knowledge of the facts in connection with the condition of the dragline, they did not

consider that appellant had been guilty of any false representations.

One phase of the rule in question is referred to in the case last cited as follows:

"Respondent cites other authorities to the effect that when a party to a contract has full knowledge of facts which he deems fraudulent as to him, and thereafter performs acts which amount to a ratification of the original contract, or a waiver of the acts of which in his opinion he has ground to complain, he is barred from subsequently maintaining an action for fraud. With this rule, we are in hearty accord."

■ In their amended complaint, respondents based a portion of their demand upon their allegation that appellant had agreed to deliver certain parts together with the dragline and had failed to deliver such articles. In its findings, the trial court did not refer to any agreement on the part of appellant to furnish parts, but found only that Ross, as an officer of appellant, had made false representations as to the condition of the dragline and that he was repairing and checking the motor. As an element of respondents' damage, the trial court included a certain sum as "parts essential to repair." The evidence does not support any judgment in respondents' favor because of parts pertaining to the dragline which Ross promised to supply and failed to deliver.

■ The burden of proof rested upon respondents to prove the allegations contained in their amended complaint. We are convinced that they did not meet that burden. We accord due weight to those findings of the trial court which are based upon disputed testimony.

We hold that the evidence preponderates against the findings.

The judgment appealed from is reversed, with instructions to enter judgment in appellant's favor for the balance due upon the purchase price of the dragline according to the terms of the contract sued upon.

BLAKE, ROBINSON, SIMPSON, and MALLERY, JJ., concur.