[No. 25036. Department Two. August 14, 1934.]

LUTHER C. KEYLON *et al., Appellants,* v. SAMUEL INCH *et al., Respondents.*[1]

*Shumate & Clarke,* for appellants.

*Green & Burnett* and *McMicken, Ramsey, Rupp & Schweppe,* for respondents.

[1]Reported in 35 P. (2d) 73.

HOLCOMB, J.—In this action for damages, based on fraud and deceit, the lower court, upon the conclusion of the testimony on behalf of appellants, sustained a challenge interposed by respondent Inch to the sufficiency of the evidence, on the ground that appellants had waived their action for damages, could not recover, and the jury was thereupon discharged. The lower court accordingly entered an order dismissing the action, with prejudice, as to respondent Inch. From that action on the part of the lower court, this appeal was taken.

 Upon the challenge to the sufficiency of the evidence introduced by appellants, the trial judge assumed as true all evidence and all reasonable inferences and deductions therefrom offered on behalf of appellants. We must so consider the evidence on this appeal.

The facts may be briefly summarized as follows: Respondent Inch, prior to 1925, owned property in Seattle known as the Gotham Garage. In 1925, he sold it to Bliss, a defendant in this action, in return for a cash consideration and a mortgage for twenty-eight thousand dollars, secured by the garage property. From 1925 to 1930, Bliss owned and rented the garage property. In 1930, due to poor business conditions, Bliss was in default on the mortgage to the amount of four thousand dollars. He therefore became anxious to sell the property. He listed it with various persons, including the real estate firm of John Davis & Company, with whom respondent was associated as a broker.

Appellants, who had resided in Yakima for some years, where they had been engaged in buying, selling and trading real estate, early in the spring of 1930 went to Seattle to look for some real estate which they could purchase, either for cash or by a trade of some of their Yakima property. On inquiry at a real estate

office, known as the "Realty Mart," a broker spoke of the Gotham Garage property. He informed them, among other things, that there was a lease on the property paying $425 per month. At that time, they personally examined this property with the idea of purchasing.

On a later visit to Seattle, they again visited the office of the Realty Mart to discuss this property. The broker who had previously shown it to them, however, had left that office. They then went to the Gotham Garage itself, and asked the tenant, one Hart, at what real estate firm the property was listed for sale, and were directed to John Davis & Company's office. It is undisputed that appellants examined the property and secured information as to the rental thereof before they approached respondent Inch at the office of John Davis & Company.

At their request, Inch discussed with appellants the terms for a sale of the garage property. According to their testimony, he stated, in response to their questions, that the lease on the property paid $425 per month; that Hart, the tenant, was paying that rent, and that he understood that he would continue to pay that rent on a further lease for a period of ten years. Having already visited the property, and knowing the tenant Hart and the monthly rental, when they approached Inch in his office the information he gave them was that which Bliss had given at the office at the time he listed the property for sale. Bliss also confirmed the statement that, when he listed the property with John Davis & Company, he stated that there was a lease for $425 per month, but did not reveal the further fact that the tenant was not paying that rent. There was no evidence that Inch had any connection whatever with the management or renting of the garage property.

Thereafter, appellants went again to the garage property, examined it, and questioned Hart as to the rent he was paying, the ability of the property to pay the rent, and his willingness to continue his tenancy. Hart, testifying as a witness for appellants, said that, under instructions from Bliss, he told them he was paying $425 per month; that the garage was paying that sum, and that he was willing under certain circumstances to lease it for a period at that rent. There was no evidence, nor could any possible inference arise from any testimony, that Inch had any part in any conspiracy between Bliss and Hart to defraud appellants.

After their conversation with Hart and their examination of the property, on June 23, 1930, appellants purchased the garage from Bliss, giving him an apple orchard of uncertain value in the Yakima valley, and $4,500 cash for his equity. In addition, they assumed the obligation of Bliss to Inch by giving a new note and mortgage for thirty-two thousand dollars to Inch in lieu of the Bliss mortgage for twenty-eight thousand dollars, plus four thousand dollars for defaults which had accrued.

It is undisputed that appellants, immediately after their purchase, took over the management and collection of rents on the property. They knew, therefore, at the time of the first payment of rental to them by Hart, that the property was not returning $425 per month, as provided in the lease. Appellant the husband testified that, within three months after the purchase, he met Bliss, who then informed him that, at the time of the purchase, he, Bliss, was not receiving, and had never received, the full rent of $425 per month. In October, 1930, Hart transferred his lease to one Avery, at which time appellants received payment in full at the rate of $425 per month from the first of July until the time of

that transfer. The new lease with Avery was at a lower rental than that provided in the former lease to Hart.

In spite of the fact that appellants knew by October, 1930, that Hart and Bliss had misrepresented the actual rental and Hart's desire to take a ten-year lease, they, nevertheless, continued to collect the rents and manage the property until July, 1931. At that time, intending to go to California, they turned the collection of rents over to respondent Inch, stating that, due to their absence, he could manage the property to better advantage than they could. During all of 1931 and until they returned to Seattle in August, 1932, appellants conducted a correspondence with respondent Inch relating to the management of the garage. In none of their letters, in spite of the knowledge as to the condition of the rents and leases on the property, did they make any claim to Inch that he had misled them by any misrepresentation.

After July, 1931, appellants made no attempt to keep the mortgage to respondent in good standing. Respondent Inch applied all the rents collected by him on the existing defaults. By August, 1932, interest on the mortgage was a year in default, a year's taxes were owing on the property, and several local improvement assessments were unpaid. At that time, respondent found it necessary to secure the consent of appellants to the transfer of the tenancy in order to secure any rental whatever. Receiving no reply to his request for consent to such a transfer, in August, 1932, he wrote that he would be forced to take some action on the mortgage unless they interested themselves in the condition of the property.

In September, 1932, on their return from California, after trading off an apartment house they had acquired there, appellants interviewed Inch and expressed a

desire to deed the property back to him in consideration of the cancellation and discharge of the note and mortgage. They desired to avoid a deficiency judgment and to get the mortgage cancelled. Inch refused to cancel the note and mortgage unless the delinquent taxes and local assessments were paid. Finally, on September 27, 1932, he did cancel and return the note and mortgage to appellants in consideration of a quitclaim deed to the property from appellants, an assignment of the rents, and a note signed by both appellants for approximately $1,100, covering only delinquent taxes and assessments. At the same time, there was also executed an assignment of a chattel mortgage upon the equipment in the premises which had run to appellants. This assignment was made to respondent Inch.

Three days after that transaction, on September 30, 1932, the original complaint in this action was verified by appellants. Bliss was made a party to the action, but made no defense, thereby consenting to a default judgment against him in the sum of $40,500 being entered. He did not appeal from that judgment, and testified as a witness for appellants.

Appellants correctly state the rule that persons suffering damages because of wrongs perpetrated on them by others, in transactions of this kind, have an election upon discovering the fraud to rescind with reasonable diligence or affirm the contract and sue for damages for the deceit. This last was the remedy they had elected to pursue. *Pronger v. Old National Bank,* 20 Wash. 618, 56 Pac. 391; *McDaniel v. Crabtree,* 143 Wash. 168, 254 Pac. 1091.

Appellants incorrectly assert that they were not bound by knowledge of the fraud perpetrated upon them until after they had located and talked with Hart, who had been the tenant.

They were just as much bound by the statement made by Bliss to them in October, 1930, that he never had received the full rent of $425, as by any other source of knowledge from whom it could have been received. The fact that they wished to get corroboration of that statement by Hart added nothing to their knowledge of their rights, which were based upon their knowledge and not their ability to prove it by the testimony of the other parties.

Appellants themselves state that respondent Inch was not a party to the original transaction. That was a transaction between appellants and Bliss, and not between them and Inch. The cash consideration was paid to Bliss. The deceit practiced on appellants by Bliss and Hart could not be attributed to Inch unless it was brought home to him in some way.

Every case like this involves questions peculiar to itself, and must be disposed of on its own special facts, the underlying question being one of intent. 27 C. J. 32.

■ Appellants strenuously insist that all of the questions involved herein were questions of fact for the jury to determine, and that the trial court was in error in sustaining the challenge and taking the case from the jury as to the facts.

Where the testimony on the question of waiver of fraud or election to rely on a contract and notes was undisputed, and of such character that only one conclusion could be drawn from it, there was no question for the jury to determine. In such a case, it was the duty of the court to act accordingly. *Widman v. Barry,* 63 Colo. 427, 168 Pac. 31.

■ In the instant case, all of the evidence came from appellants, and if there could be but the one inference drawn, that they made a settlement, as it must be called, on September 27, 1932, with full knowledge

that the rentals of the garage had been misrepresented to them by Bliss and Hart, they would be bound by that settlement, either as a waiver or estoppel.

A leading case upon this question is *Schmidt v. Mesmer,* 116 Cal. 267, 48 Pac. 54, which was an action by tenants of a hotel against a landlord to recover damages for false representations as to the income of the hotel. It appeared that, over a year after plaintiffs had knowledge of the alleged fraud, they asked to have the rent reduced, without any intimation of the alleged fraud; that afterwards they obtained an extension of time for payment of rent, without any such intimation; and that they had failed to pay the rent. It was held that they had waived the alleged fraud and their right to damages. It was there said:

"But this rule, which relieves a party when he chooses to sue for damages from many of the acts required of him when he elects to rescind, is subject to some just limitations. If, after his knowledge of what he claims to have been the fraud, he elects not to rescind, but to adopt the contract and sue for damages, he must stand towards the other party at arm's length; he must on his part comply with the terms of the contract; he must not ask favors of the other party, or offer to perform the contract on conditions which he has no right to exact, and must not make any new agreement or engagement respecting it; otherwise he waives the alleged fraud. . . . [Quoting Cooley, Torts, 505.]

"In *Doherty v. Bell,* 55 Ind. 205, the court say: 'If the appellee, with full knowledge of all the facts, as we think it fair to presume from the allegations in the reply it was intended to charge he had, and after the appellants became the owners of it, agreed to pay the note, *provided a certain extension of time was allowed him,* and in consideration thereof such an extension was given him, we must regard him as having ratified the execution of the note, and as having waived whatever objection or defense he may have had to the manner of its execution.'

In *St. John v. Hendrickson*, 81 Ind. 350, the court say: 'We fully recognize and approve the rule that a party may retain what he receives, stand to his bargain, and recover for the loss caused him by the fraud. We do not mean to run counter to this rule. We neither hold nor mean to hold, that affirmance by retention of the thing bargained for cuts off an action for damages. We do hold that where a party, with full knowledge of all the material facts, does an act which indicates his intention to stand to the contract, and waive all right of action for fraud, he cannot maintain an action for the original wrong practiced upon him. Where the affirmance of the contract is equivalent to a ratification, all right of action is gone. . . . Nor are we unmindful of the settled rule that the defrauded party has an election of remedies. . . . We do decide that where a party, with full knowledge, declines to repudiate a transaction known to him to be fraudulent, and fully and expressly ratifies it, he can neither rescind nor maintain an action for damages.' ''

Further discussion and further citation of cases was then made, and the conclusion reached which we have heretofore stated. That case has been followed and quoted approvingly in a number of subsequent cases, which have been examined and which were cited by the trial judge. *Timmerman v. Gurnsey,* 206 Iowa 35, 217 N. W. 879; *Green v. Rodgers,* 152 Minn. 525, 189 N. W. 449; *Humphrey v. Sievers,* 137 Minn. 373, 163 N. W. 737; *Tipton v. Ellsworth,* 18 Idaho 207, 109 Pac. 134.

The Idaho case, last cited, as appellants state, held that there had been no actual fraud perpetrated. It just as distinctly held, however, that, had there been actual fraud procuring the seller to waive the original contract and the acceptance of a deed and the execution of a mortgage upon different terms, they would waive any question of fraud, had any existed.

To the same effect is *Widman v. Barry, supra,* by

the Colorado court. *Virtue v. Stanley,* 87 Wash. 167, 151 Pac. 270, was decided upon the same principle. See, also, *Victor Products Corporation v. Edwards,* 172 Wash. 1, 18 P. (2d) 1045.

In *Timmerman v. Gurnsey, supra,* the Iowa supreme court had this to say:

"Defendants [in the instant case, plaintiffs] in getting such important concession, ought not to be permitted to reserve in concealment an intent and purpose directly or indirectly to avoid payment of what they, with full knowledge of the facts, deliberately agreed to pay."

In *Burne v. Lee,* 156 Cal. 221, 104 Pac. 438, after restating the well settled rule, as first announced in the *Mesmer* case, *supra,* the court said:

"Now, it is well settled that when a party has been induced by fraud to enter into a contract, he may elect either to rescind the contract by restoring whatever he has received under it, or he may affirm the contract, retaining whatever advantage he may have acquired, and still have his action for damages for deceit practiced upon him in making the contract. This rule is, however, subject to limitations which apply whether the contract, to which the charge of fraud is addressed, is an executed or executory contract. One of these limitations is that when a party claiming to have been defrauded, enters, after discovery of the fraud, into new arrangements or engagements concerning the subject-matter of the contract to which the fraud applies, he is deemed to have waived any claim for damages on account of the fraud."

Appellants also strongly rely on the *Pronger* case, *supra; Warwick v. Corbett,* 106 Wash. 554, 180 Pac. 928; and *Shrader v. Slocum,* 163 Wash. 178, 300 Pac. 524.

The first case cited held that one who has been induced to purchase promissory notes through fraudulent representations is not barred from maintaining

an action for damages on account of the fraud by the fact that he affirmed the contract and assumed ownership of the notes. That accords with the general rule obtaining here and elsewhere. In the second case cited, we held that fraud in misrepresenting the profits of a mill business is actionable although the purchaser made investigations and obtained advice from others, where he never had the opportunity to test the accuracy of the representations. In the third case cited, we held that the failure of defendant to assert fraud in a trade until commencement of plaintiff's action to foreclose a mortgage on the land, would not estop the defendant from setting up the fraud *where silence had not operated to the injury of the plaintiff*.

In the instant case, it might be found by triers of the fact that there had been deceit, misrepresentation and fraud practiced upon appellants by Bliss and Hart which would still leave the matter in the hands of appellants to settle the affair themselves. Under the cases cited, they had that right. That is, apparently, what they knowingly did. The foregoing cases by this court do not hold to the contrary.

.For the reasons stated in the cases cited by us and followed by the majority of courts, we conclude that the judgment of the trial court must be, and is, affirmed.

BEALS, C. J., TOLMAN, BLAKE, and GERAGHTY, JJ., concur.