[No. 32933.   Department Two.   November 12, 1954.]

RUSSELL J. BARIEL, *Appellant*, v. GERRIT TUINSTRA, *Respondent*.[1]

[1] Reported in 276 P. (2d) 569.

*Samuel P. Hale* and *R. V. Welts,* for appellant.

*Jesse Simmons* and *Fred C. Campbell,* for respondent.

DONWORTH, J.—Plaintiff appeals from a judgment dismissing his action for rescission of a contract by which he purchased from defendant one hundred head of cattle and certain farm machinery.

In his complaint, plaintiff sought rescission ·on grounds that defendant fraudulently represented that the cows were free from Bang's disease, whereas the herd contained a number of Bang's "reactors" (animals infected with the disease) and some "suspects" (animals possibly infected).

Defendant's answer denied that he represented the cows to be free from the disease and alleged that he voluntarily informed plaintiff that the herd had been tested and four "reactors" found in the test were still in the herd.

The trial court found that defendant had defrauded plaintiff by concealing from him the fact that the herd contained four Bang's disease "reactors," and that the herd was quarantined by the state department of agriculture at the time of the sale. The court ruled, however, that plaintiff could not have the sale rescinded for these four reasons: (1) that plaintiff could have learned by inquiry at the department of agriculture at the state capitol that the cows had been blood tested and that some of them were "reactors"; (2) that plaintiff should have demanded sooner that the sale be rescinded; (3) that plaintiff did not make a specific tender back to defendant of the farm machinery covered by the contract when plaintiff sought to rescind the sale, and (4) that the contract for the sale of the cattle and farm machinery and another contract (simultaneously agreed upon by the parties) by which plaintiff agreed to purchase defendant's dairy farm constituted one indivisible contract, and that plaintiff was not entitled to elect to rescind the contract for the sale of the cattle and machinery while retaining the benefit of the contract for the sale of the real property.

From the resulting judgment of dismissal, plaintiff appeals.

Except as to the making of the alleged misrepresentations, the facts in this case are not seriously in dispute. There is little difference between appellant's version of the facts and the findings of fact entered by the trial court (although he assigns as error the making of three findings), but appellant principally complains that the trial court erred in drawing certain legal conclusions from the facts. The basic facts are these:

Prior to the transaction involved in this case, respondent owned and operated a one-hundred-sixty-acre dairy farm near Carnation, Washington, on which he had sixty-seven milk cows and thirty-three head of young stock. In January, 1953, a state agricultural department veterinarian tested respondent's cows and discovered that eight of them (called "reactors") were infected with Bang's disease and twenty more were "suspects." Respondent could have disposed of the eight reactors by slaughtering them or selling them for slaughter within fifteen days, in which event he would have been reimbursed by the state for a part of their value. He disposed of only four of the infected cows, keeping the other four in the herd.

Because respondent had not disposed of all the reactors within fifteen days, the state placed an automatic quarantine on the herd, notifying him that he could not sell any of the cows except for slaughter and could not sell any milk from the herd except to a dairy which would pasteurize the milk.

In March, appellant heard that respondent wanted to sell his cattle and lease his dairy farm. Appellant began to negotiate with respondent about leasing the farm and buying the livestock. Respondent then decided to sell both the farm and the cattle.

Appellant had operated a dairy farm approximately twenty years earlier but had had no recent experience in that business. He inspected respondent's farm and cattle several times. The herd was composed of Guernsey, Holstein, and Jersey cows. Appellant told respondent that he (appellant) preferred Holsteins, and that he intended to sell the Guernseys and Jerseys from time to time and replace them with Holsteins. Respondent did not inform appellant that the herd was quarantined so it would be impossible for him to sell the Guernseys and Jerseys as dairy cows, though they could be sold for slaughter (at a considerable loss).

On April 16, 1953, appellant and his wife and daughter went to respondent's farm to negotiate for the purchase of the farm and the cattle and farm machinery. Prior to reaching any agreement, appellant asked if respondent had a

health certificate on the cows. Respondent replied that the herd had been blood tested recently and the test showed the herd to be free from Bang's disease, but that there were four "suspects" in the herd. (Respondent testified that he said there were four "reactors" in the herd, but the trial court found that testimony to be false.)

Respondent and appellant agreed upon and dictated to appellant's wife the terms of a contract for the sale of the real estate by respondent to appellant for sixty-five thousand dollars and the terms of a contract for the sale of the personal property (cattle and farm machinery and equipment) for twenty-seven thousand dollars. Appellant's wife wrote out in longhand the terms of the contracts of sale in one document, which provided exactly how much should be paid each month on the real-estate contract and on the personal-property contract until the personal-property contract was paid in full, after which payments would be four hundred fifty dollars a month on the real-estate contract until that was paid off. This agreement (which was signed by the parties) provided for the payment of 4½ per cent interest on the unpaid balance of the real-estate contract and five per cent interest on the unpaid balance of the personal-property contract.

On April 20, 1953, appellant and respondent entered into an executory contract of sale of the dairy farm real estate for sixty-five thousand dollars. The contract provided that title to the real estate would not pass to appellant until the executory contract had been paid off in full. The contract also provided that payments due on the contract should be secured by an assignment by appellant to respondent of moneys to become due each month from the Golden Rule Dairy for milk purchased by it and produced from the herd to be maintained on the farm.

On April 22, 1953, appellant purchased from respondent the one hundred head of cattle on the farm and certain items of farm machinery and equipment, including a milking machine. Appellant paid eight thousand dollars down on the purchase price of the personal property and gave his promissory note for nineteen thousand dollars for the balance.

Respondent conveyed title to the cattle and other personal property to appellant by bill of sale, and appellant gave back to respondent a chattel mortgage on the property thus conveyed to secure payment of the nineteen-thousand-dollar note.

The Golden Rule Dairy accepted an assignment by appellant directing it to pay to respondent certain sums out of the amounts to become due appellant each month for milk produced by the dairy herd and purchased by it. The assignment provided that certain specified sums should be applied each month upon the real-estate contract, and that certain other specified sums should be applied in payment of the note given in the purchase of the personal property.

Appellant and his wife took possession of the farm and the personal property on May 15, 1953. On Saturday, July 18, 1953, appellant received from the state department of agriculture a notice of the reissue of the quarantine on the herd because of the presence of cows infected with Bang's disease. On the following Monday, appellant went to Olympia and looked up the records on the herd at the office of the state department of agriculture. He discovered that the herd had been quarantined at the time he purchased it in April.

A few days later, respondent was driving along a road beside the farm and stopped to talk to appellant, who asked him why he had sold him a quarantined herd of cattle. Respondent did not answer but said he did not want to have any trouble and that they should "stay out of court." Respondent asked appellant, "What do you want me to do? Do you want me to clean up this herd, or do you want your money back?"

Appellant, who intended to talk to a veterinarian about the seriousness of Bang's disease before deciding what to do, asked respondent when he would be coming back again, and respondent stated that he would be back in five or six days. There is a dispute in the evidence over how long it was before respondent returned, appellant testifying it was two or three weeks and respondent that he returned in a week.

We think it is immaterial which version is correct. (The trial court made no definite finding on the issue.)

Before respondent returned, appellant had conferred with a veterinarian, who told him that Bang's disease is highly contagious among cows and can infect human beings (and especially those who work with infected animals) with undulant fever, a serious illness. (See *Nelson v. West Coast Dairy Co.*, 5 Wn. (2d) 284, 105 P. (2d) 76, 130 A. L. R. 606, and *Streeter v. Vaughan*, 39 Wn. (2d) 225, 235 P. (2d) 193.)

It is undisputed that, on the second occasion when respondent and appellant met, respondent asked him what he had decided to do, and he answered, "I want my money back." Respondent immediately replied: "I'm not going to give it to you."

There were some negotiations between the parties, and both testified that respondent did offer to "make good" for two of the four "reactor" cows, but appellant rejected the offer. However, appellant did not make a specific offer to return the cattle and all of the farm machinery and equipment included in the personal-property sale contract after respondent's refusal to give appellant his money back.

After respondent refused to allow appellant to rescind the personal property sale, appellant went to the Golden Rule Dairy and endeavored to have payments under the assignment stopped as to the personal-property contract. The dairy manager refused to stop payments, and the payments continued to be made to respondent until this suit was instituted and a restraining order was obtained, after which the payments were made into the registry of the court.

When the dairy manager refused to stop making these payments to respondent, appellant turned the matter over to his attorney, apparently about the middle of August, 1953. This suit was filed November 12, 1953. Appellant continued to care for the dairy herd and to send the milk to the dairy until the date of the trial, which was February 10, 1954.

In January, 1954, appellant had the herd tested again by the state department of agriculture, and the test showed that the herd contained ten cows infected with Bang's disease and twenty-three "suspects."

Before the action was commenced, appellant, with respondent's permission, sold five barren cows and six steers for a total of $1,100. Without respondent's permission, appellant turned in the milking machine purchased from respondent on the purchase of a new milking machine and received a credit of $160 (the fair market value of the old milking machine) on the price thereof.

During the time appellant operated the dairy farm, he made no profit whatsoever, over and above payments he made to respondent on the land and cattle contracts, because the total expense of operating the herd (feed, wages, electricity, etc.) exceeded the amount he received from the sale of the milk after payments to respondent were deducted.

After both appellant and respondent had rested their cases, the trial court asked counsel for appellant: " . . . is the sale of this personalty a transaction that can be rescinded while keeping the benefits and fruits of the sale of the land?" The attorney for appellant pointed out that respondent's answer raised no issue that the land and personalty contracts were one indivisible contract. Appellant's attorney asked to reopen the case in view of the question asked by the court, and the motion was granted. Appellant put in evidence the land contract and then rested.

The following colloquy between court and counsel then occurred:

"THE COURT: I notice that the answer doesn't tender the defense that I just mentioned [that the land and personal property contracts were indivisible]. I don't know. They may not be making any point of it. Are you or are you not, Mr. Simmons? MR. SIMMONS: What? THE COURT: I say I notice your answer does not tender such a defense. Are you making any point of it, or not? MR. SIMMONS: The answer is yes. . . . THE COURT: Is it your position then that if the Court finds that plaintiff is entitled to rescission, it would rescind the whole transaction? MR. SIMMONS: Yes. MR. WELTS: Do you want the land back? THE COURT: Do you want the land back? MR. SIMMONS: We better ask the parties about that. MR. WELTS: Do you want the land back? If so, we offer it. MR. SIMMONS: That is our position. MR. WELTS: We tender to the parties a conveyance of the land and the conveyance of the cattle, to

satisfy the position counsel now takes. Heretofore, it hasn't been in the lawsuit, but we are perfectly willing, if the Court rescinds, to let rescission be complete, though our position is that it hasn't anything to do with this lawsuit at all."

In his oral opinion rendered after the argument of counsel, the court ruled that the land and personal-property contracts were one indivisible contract, and that appellant's offer to return the land (if respondent wanted it back) came too late..

Appellant urges on the appeal that the trial court erred in ruling that the two contracts were one indivisible contract and that appellant's offer to return the land came too late. Appellant contends (1) that the contracts were separate and divisible contracts, and (2) that the trial court should not have considered the defense that the two contracts were one indivisible contract because respondent did not plead such a defense and consequently waived it, even if it were available to him on the facts in this case.

█ It will not be necessary to pass upon appellant's second contention on this phase of the case, because we are convinced that the trial court erred in concluding that the land and personal-property contracts constituted one indivisible contract.

· In *Darst v. Meduna,* 15 Wn. (2d) 293, 130 P. (2d) 361, we set out the law relative to severable or entire contracts in this language:

"It is, of course, well settled that, when the subject of a contract of sale consists of several different articles, and there is an apportionment of the purchase price to each, the contract is severable. [Citing cases.] But when two or more articles are sold together for a gross sum, or the purchase price is not apportioned to the different articles, the contract is entire. [Citing cases.]"

█ In the preliminary agreement drawn up and signed by the parties, the consideration for the land and the consideration for the personal property were each separately stated. When the formal documents were executed to consummate the sale of the realty and the sale of the personalty,

each sale was treated as a separate contract, with the same separate consideration stated for each transaction. A different method of conveying title was used in the two contracts, and a different rate of interest was agreed upon for the unpaid balance due on each contract.

The trial court seems to have felt compelled to hold that the two contracts were one indivisible contract because of the assignment made by appellant and accepted by the Golden Rule Dairy. The assignment provided that payments on the real-estate contract and on the personal-property contract would be made from the proceeds of the sale of the milk by appellant to the dairy. However, the assignment did not change the nature of the contracts in any way. Rather, the assignment merely provided for a method of collaterally securing the payments called for in each of the two contracts. If the cows had suddenly been destroyed by some calamity, making it impossible for appellant to comply with the agreement to ship milk to the Golden Rule Dairy, appellant would still have been bound by the terms of each contract to make the payments called for therein.

Since the trial court found that respondent fraudulently represented the cows to be free of Bang's disease when they were infected with the disease, and that he failed to disclose to appellant that the herd was quarantined at the time of the sale, and the evidence does not preponderate against the trial court's findings on this issue, appellant was entitled to rescind the personal property sale unless: (1) he had no right to rely on the fraudulent representation, or (2) he did not seek to rescind promptly enough, or (3) he did not make a sufficient tender of all of the personal property to respondent to support an action for rescission.

The trial court held, in effect, that appellant had no right to rely on the fraudulent representation because he could have traveled to the state capitol prior to the sale and checked the records of the department of agriculture, which would have disclosed that the herd was quarantined as a result of the presence of animals infected with Bang's disease.

Chapter 249, Laws of 1909, § 288, p. 978 [*cf.* RCW 9.08-.020] provides:

"Every owner or person having charge thereof, who shall . . . keep . . . any animal having any contagious or infectious disease; or who shall sell, let or dispose of any such animal knowing it to be so diseased, without first apprising the purchaser or person taking it of the existence of such disease, shall be guilty of a misdemeanor."

That statute imposes a duty upon the seller of a diseased animal to inform the purchaser of the condition of the animal, whether the purchaser asks any questions or not. A seller under positive statutory duty to speak the truth will not be heard to come into a court of law and contend that if his victim had been less gullible he could have found out the true state of facts from the public records.

Furthermore, in *Cloakey v. Bouslog*, 39 Wn. (2d) 66, 234 P. (2d) 880, a case which was quite similar to the instant case, we reached the same result without reference to the foregoing statute, saying:

"We do not doubt that a statement that a herd is free from Bang's disease, though false, might be made in good faith (of course, if the statement constitutes a warranty, the question of good faith would be immaterial); but here the appellants [sellers] had every reason to suspect, if not to know, that the herd was infected. It was under quarantine, and six reactors and one suspect had been permitted to remain in the herd after the last test prior to the sale to respondent, although there was evidence that the reactors and the suspect were disposed of prior to the sale. . . . We are convinced that the trial court was correct in holding that appellants' statement that the herd was free from Bang's disease was a fraudulent misrepresentation, and that the respondent [buyer] justifiably relied thereon."

Consequently, we hold that appellant had a right, both as a matter of fact and as a matter of law, to rely on respondent's representation that the cows were free from Bang's disease and was not required to search the records at the state capitol.

On the issue of whether appellant was too dilatory in seeking to rescind, respondent relies on the fact that ap-

pellant discovered on July 18, 1953, that he had been defrauded, and did not file suit to rescind the sale until November 12, 1953. During that time, respondent argues, appellant continued to "make payments on the contract" and to "retain the benefits of the contract for himself." The first argument ignores the fact that the payments were made involuntarily through the Golden Rule milk assignment, upon which appellant unsuccessfully tried to stop payment. The second argument overlooks the undisputed testimony that appellant's operating expenses during this period exceeded the payments he received from the sale of the milk, leaving him no "benefits" to retain.

When respondent refused to take back the cows at the time that appellant sought to rescind the sale, appellant became an involuntary bailee of the milk cows and had no alternative but to continue operating the dairy farm and selling the milk pending the outcome of this litigation. Consequently, respondent is in no position to complain because appellant continued to operate the dairy farm in order to preserve the fruits of the litigation for the prevailing party when he had no choice but to do just that.

In the recent case of *Eliason v. Walker,* 42 Wn. (2d) 473, 256 P. (2d) 298, we said:

"Diligence in rescission is a relative question, and whether or not there has been an unreasonable delay in a given case depends upon the particular circumstances of that case."

In the case at bar, according to the trial court's findings, appellant learned of the fraud practiced on him by respondent on July 18, 1953, and attempted to rescind the personal property sale either in the latter part of July or in the early part of August, 1953. Prior to the demand by appellant for rescission, there had been some negotiations between the parties which terminated when respondent refused to "make good" for more than two of the diseased cows. There was absolutely no showing by respondent that he had altered his position to his prejudice in any way, either prior to the oral demand for rescission or prior to the filing of this suit. The trial court felt that respondent had been prejudiced by

the fact that more cows in the herd might have contracted Bang's disease before the demand for rescission. Since respondent, not appellant, was responsible for the diseased cows being in the herd at the time of the sale, and since the testimony plainly indicated that the diseased cows could have infected the whole herd in the two months between the date when appellant took possession of the herd and the date when he discovered the fraud, respondent and not appellant is responsible for any prejudice from that source.

We hold that, under the facts of this case, there was no unreasonable delay before appellant attempted to orally rescind the sale nor before appellant filed this suit. By his fraudulent conduct in misinforming appellant about the condition of the cows, respondent caused any damage which he might have suffered by the lapse of time before the action was commenced.

■ Respondent's final contention, accepted as a valid one by the trial court, is that appellant cannot recover because he did not specifically tender back to respondent the farm machinery and equipment which was included with the cattle in the personal property sale at the time that appellant orally demanded a rescission of the sale.

In *Lucas v. Andros*, 185 Wash. 383, 55 P. (2d) 330, we quoted with approval this rule from 13 C. J. 621, § 680:

" 'In order to rescind a contract for fraud, the party defrauded must as a general rule restore, or offer to restore, the consideration which he has received under the contract. The trend of the later cases seems to be toward *a reasonable and equitable application of the rule*, and to hold that it requires a plaintiff to do merely what equitably he ought to do.' " (Italics ours.)

Having regard for the foregoing rule, we think it is unnecessary for us to pass on the sufficiency of appellant's offer to return the personal property to respondent at the time of the oral demand for rescission of the contract. Appellant commenced this action for rescission within a reasonable time after his oral demand for rescission of the sale, and in his complaint (to which was attached a copy of the chattel mortgage which listed *all* the items of personal property)

prayed that "the parties be restored to their condition prior to the sale" and for general equitable relief.

That plainly was an offer to do equity and to restore to respondent all personal property described by the contract and in the complaint. Such an offer is sufficient.

To summarize, we hold that the trial court was correct in finding that appellant was induced to enter into the contract for the purchase of the personal property by fraud on the part of respondent, but that the court erred in entering conclusions of law to the effect that appellant had no right to rely on the fraudulent representations and was dilatory in attempting to rescind. We further hold that the real-estate and personal-property contracts were separate contracts and not one indivisible contract, and that appellant made a sufficient tender to respondent of the farm machinery and equipment described in the personal-property contract.

■ Since respondent and appellant each have asked in open court for a rescission of both the personal-property contract and the real-estate contract (if any rescission is granted), the judgment must be reversed, with instructions to the trial court to enter a judgment rescinding both contracts and placing the parties in the same position as they respectively occupied before the contracts were executed, in so far as that is possible.

In computing the amount to be awarded in the judgment, the court shall give appellant credit for all moneys paid on both contracts since they were executed, with interest from the date of the filing of this suit. Against this sum, respondent shall be given credit of $1,100 for the eleven cows sold, $160 for the milking machine, and $350 per month for the rental value of the dairy farm from May 15, 1953, to date of judgment.

If the parties shall agree by stipulation in writing filed in the trial court on the amounts of all items to be taken into account between them in the settlement of their mutual accounting, judgment shall be entered in accordance with their stipulation for the balance due either party as of the date of judgment. If they cannot so agree, the trial court may take

such additional testimony as it deems proper in order to compute the balance due either party as of the date of judgment, in which event the court shall settle their mutual accounts and render a proper judgment based on such findings as it shall make as a result of such additional proceedings.

The judgment appealed from is hereby reversed, with instructions to enter a new judgment in accordance with the directions contained herein.

GRADY, C. J., SCHWELLENBACH, HILL, and WEAVER, JJ., concur.