[No. 34894.    Department Two.    June 9, 1960.]

MERRITT FINES, *Appellant,* v. WEST SIDE IMPLEMENT
COMPANY, INC., *Defendant,* MINNEAPOLIS-
MOLINE COMPANY, *Respondent.*[1]

*Gavin, Robinson & Kendrick* and *Robert R. Redman,* for
appellant.

*Brown, Hovis & Cockrill,* for respondent.

HILL, J.—This is an action for damages based on a claimed
rescission of the contract for the sale of a harvester. The
defendants were the dealer, who sold the harvester to the
plaintiff, and the manufacturer of the harvester. The trial
court dismissed the action as to the manufacturer at the
close of the plaintiff's case, and the plaintiff appeals.

Two issues are presented by the parties to this appeal:

1.  Was there evidence to go to the jury that the plaintiff,
Merritt Fines, relied on a false statement or statements
contained in the advertising literature of the manufacturer,
the defendant Minneapolis-Moline Company, a corporation;
and that, in consequence of such reliance, he was induced
to purchase one of the manufacturer's harvesters?

2.  If the plaintiff did so rely, did he by unequivocal acts

[1]Reported in 352 P. (2d) 1018.

so clearly waive his right to rescind that it could be decided that he had done so as a matter of law?

Two other issues are raised by the court *sua sponte*:

3. Can the purchaser of machinery recover the purchase price from the manufacturer, who is not the seller, where the relief sought by the purchaser is based on rescission of the contract of sale? (The distinctions between the recovery of damages for fraudulent misrepresentations or breach of warranty, express or implied, and rescission are to be kept in mind in considering this question.)

4. If the answer to "3" is no, did the purchaser establish sufficient damages against the manufacturer to give him a basis for an appeal to this court from the judgment of dismissal on the theory of damages for fraud?

In July, 1952, the plaintiff, then a young man of twenty-one but already an experienced farmer, bought a "Minneapolis-Moline S-12 Harvester" for $5,263.86 from the West Side Implement Company, a corporation, hereinafter called the dealer. There were two deferred payments of $1,754.62 each, one payable July 21, 1953, and one payable July 21, 1954. Promissory notes were given for these payments. The bank, where the plaintiff did business, handled the collection of these notes, but whether as owner or as assignee for the purpose of collection does not appear from the record.

The plaintiff, who was farming in a dry area, needed a harvester that would cut wheat and barley at a low level above the ground. The particular harvester which he purchased was advertised by the Minneapolis-Moline Company, a corporation hereinafter called the manufacturer, as having a cutting bar that could be lowered to two inches above the ground, or be raised to a maximum height of forty-one inches, and as being "designed to do an excellent job in any type of grain."

On attempting to use the harvester in the 1952 harvest, the plaintiff found that the cutter bar would not go lower than five inches above the ground. This did not permit him to cut his wheat with sufficient straw to avoid losing a substantial amount of the grain.

Adjustments and changes in the machine were attempted

by the dealer and two representatives of the manufacturer, but they were unable to get the machine into operating condition to harvest the 1952 wheat crop; and the plaintiff had to borrow equipment from neighbors for that purpose. He did use the S-12 Harvester in alfalfa that year, and it did a "fairly good job."

After the 1952 harvest, the dealer and a representative of the manufacturer told the plaintiff that a modification for his machine had been worked out, which would permit it to operate properly the following crop season. The so-called factory modification was accomplished just before the start of the barley harvest in 1953. Prior thereto the plaintiff had been called into military service, and he was in Germany during the 1953 and 1954 harvests, and until February, 1955.

The plaintiff turned his farming operations over to a neighbor, Orville Crom, who found that the same defect still existed in the machine and it would not properly harvest the plaintiff's barley. He reported this condition, but was told by the dealer that nothing further could be done. Crom then set the machine aside, and it has never been used since.

In August, 1953, the plaintiff was advised by Crom that the machine would not work, and the plaintiff then wrote a letter to Jack Breeding, the dealer's manager through whom he had purchased the harvester, asking him to sell the machine. This Breeding declined to do.

The plaintiff apparently made no further effort to dispose of the machine, but wrote to the bank in 1954, asking for and obtaining an extension of time for the payment of the note for $1,754.62 due in July, 1954. He returned from Germany in February, 1955, and made the deferred payment September 12, 1955, some seven months after his return from Germany and at least three months after this action had been commenced. No claim of fraud and no demand for rescission was made on the dealer until 1955, and the first knowledge that the manufacturer had of the rescission or of any claim of fraud was when served with the complaint in this action some time in the spring of 1955. (The complaint, as shown in the transcript filed in this court, is not

verified; no date of service is shown. The filing date is June 8, 1955.)

The plaintiff alleged, in general terms, representations that the "Minneapolis-Moline S-12 Harvester" was a suitable machine and device for the purpose of properly harvesting the grain crops of the plaintiff, and, in equally general terms, alleged that there were defects in the harvester so that it was not "properly designed or manufactured for the purpose of harvesting the grain crops of the plaintiff."

A bill of particulars, filed in compliance with an order to make more definite and certain the representations relied upon, did no more than refer generally to advertising material put out by the defendant,

". . . in which the S-12 Harvester was represented as an all-purpose harvester and one capable of suitably and properly harvesting grains . . ."

At the time the plaintiff's deposition was taken in January, 1958, when asked concerning the representations on which he relied, he failed to recall that the range of the cutting bar was one of them. Not until the trial, in August of 1958, did the plaintiff become specific on that score; he then remembered the representation—that the cutting bar could be lowered to two inches above the ground—was one on which he had placed great reliance.

At the time of trial, the dealer was in financial difficulties, and, while it had appeared and answered, its attorneys withdrew and it did not participate in the trial.

At the conclusion of the plaintiff's case, the manufacturer moved for a dismissal. This the trial court granted, and judgment dismissing the action against the manufacturer was entered; and from that judgment this appeal is prosecuted. The question as to whether the plaintiff was entitled to a judgment against the dealer, and, if so, in what amount, was reserved for further consideration; and the record does not disclose what disposition of the case was made as between the plaintiff and the dealer.

We come now to a consideration of the issues stated at the beginning of this opinion.

The trial court held that the jury could find, from the evidence, that the plaintiff had placed reliance on the representations in the manufacturer's advertising to the effect: (a) that the cutting bar on the harvester purchased could be lowered to two inches above the ground; and (b) that "you'll find" that the harvester purchased was designed to do an excellent job in any type of grain.

The trial court further held that the jury could find that both representations were false.

The first issue is raised by the manufacturer's insistence that the judgment of dismissal can be sustained on the ground that fraud was not established by clear, cogent, and convincing evidence. It is urged that representation (a), *supra*, was clearly an afterthought, and was not relied upon; and that representation (b), *supra*, was obviously no more than "dealer's praise."

We are impressed with the argument, but, for the purposes of this opinion, we will assume that there was sufficient evidence to take the case to the jury insofar as the essential elements of actionable fraud are concerned.

■ The trial court based its disposition of the case on the issue of waiver, holding that the combination of the following facts and circumstances conclusively established a recognition of the contract for the purchase of the harvester, and established, as a matter of law, the waiver of any right to rescind the contract:

a. Knowledge by the plaintiff from August, 1953, until the attempted rescission in the spring of 1955, that the harvester was not as represented.

b. The plaintiff's request, after such knowledge, that the dealer or the dealer's manager sell it for him.

c. Plaintiff's request, prior to July, 1954, for an extension of time on the payment of the note for the last installment on the purchase price.

d. Plaintiff's delay of several months, after his return from Germany, before notifying the dealer of a rescission.

e. Plaintiff's failure to give any notice to the manufacturer of the claimed fraud until the service of the complaint in this action.

f. Payment of the promissory note representing the last installment upon the purchase price in September, 1955, after he had commenced this action. (The plaintiff's explanation for making this payment is that he assumed he would have trouble getting the necessary credit from the bank for his farming operations if he failed to pay the note; but there is no evidence to support the assumption. With reference to this payment of this note, in the principal sum of $1,754.62, it should be noted that if the plaintiff had a cause of action in this case, he had a defense to any demand for this payment, unless the bank was a holder in due course. No issue is raised as to his augmenting, instead of attempting to mitigate, his damages in that amount.)

We are in accord with the conclusion of the trial court—that there had been a waiver of the right of rescission.

The trial court, in announcing its decision, carefully reviewed the applicable authorities, recognizing that waiver is generally a question for the trier of the facts (*Lawson v. Helmich* (1944), 20 Wn. (2d) 167, 145 P. (2d) 537, 151 A. L. R. 930), but that delays and other actions which might not constitute a waiver of the right to sue for damages will constitute a waiver of the right to rescind. (*Schmidt v. Mesmer* (1897), 116 Cal. 267, 48 Pac. 54, quoted in *Keylon v. Inch* (1934), 178 Wash. 522, 35 P. (2d) 73); and that the circumstances here were such that the court could hold, as a matter of law, that a waiver of the right to rescind had been established. (*Brown v. VanTuyl* (1952), 40 Wn. (2d) 364, 242 P. (2d) 1021; *Coovert v. Ingwersen* (1951), 37 Wn. (2d) 797, 226 P. (2d) 187; *Bonded Adjustment Co. v. Anderson* (1936), 186 Wash. 226, 57 P. (2d) 1046, 106 A. L. R. 166; *Keylon v. Inch, supra.*)

We desire to emphasize that we are not discussing a waiver of fraud, or of a right to damages, but the waiver of the right of rescission.

The plaintiff, on discovering the fraud in connection with the sale of the harvester, had a choice of remedies: damages or rescission. The first involved an affirmance of the contract, and the latter a repudiation of the contract. In *Schmidt v. Mesmer, supra,* the supreme court of California

clearly states one of the basic distinctions between the two remedies (p. 270),

"It is no doubt the law, that while where a party seeks to rescind a contract into which he was induced to go by the fraudulent representations of another party, he must rescind at once upon the discovery of the fraud, and restore the other party, as near as may be, to his former condition, yet he may elect to go on with the contract, and sue to recover damages for the deceit, without giving any warning to the other party that he intends at some future time to charge him with fraud. . . . "

*McKown v. Davis* (1955), 47 Wn. (2d) 10, 285 P. (2d) 1048; *Salter v. Heiser* (1951), 39 Wn. (2d) 826, 239 P. (2d) 327; *Getty v. Jett Ross Mines, Inc.* (1945), 23 Wn. (2d) 45, 159 P. (2d) 379; *Keylon v. Inch, supra.*

Delay in commencing the action, if within the statute of limitations, delay in making payments or securing extensions of time and offering the harvester for sale, would all be consistent with an affirmance of the contract, but they are not consistent with the concept of rescission.

The rule is that the party who desires to rescind a contract on the ground of fraud must, upon the discovery of the facts, at once (or at least reasonably quickly) announce his purpose and adhere to it. *Brown v. VanTuyl, supra; Coovert v. Ingwersen, supra; Ainscough v. O'Shaughnessey* (1956), 346 Mich. 307, 78 N. W. (2d) 209; *Estrada v. Alvarez* (1952), 38 Cal. (2d) 386, 240 P. (2d) 278; *Bariel v. Tuinstra* (1954), 45 Wn. (2d) 513, 276 P. (2d) 569; *Eliason v. Walker* (1953), 42 Wn. (2d) 473, 256 P. (2d) 298; *Cunningham v. Studio Theatre* (1951), 38 Wn. (2d) 417, 229 P. (2d) 890. This would be particularly true where the contract of sale involved expensive mechanical equipment subject to rapid depreciation if not properly cared for.

The plaintiff (appellant) italicized the following statement at page 32 of his brief:

*"It will be recalled that the machine was never actually used after the attempt to utilize it by Crom in 1953, and it was then and at all times since has remained abandoned."*

One who abandons a harvester, costing over five thousand dollars, in August, 1953, with full knowledge of its failure

to conform to the representations which induced its purchase, and gives no notice of the abandonment or of his intention to rescind the contract, by which he purchased it, until the spring of 1955, should, as a matter of law, be held to have waived his right to rescind the contract. The attempt, during that period to sell the harvester and the securing of extensions of time to make payments on it, constitutes additional conduct inconsistent with a disaffirmance and rescission of the contract.

What we have just said is decisive of the issues raised on this appeal, and we do not reach the issues raised by the court *sua sponte*; however, those issues would have to be disposed of before the plaintiff could prevail on this appeal. We have indicated that the time is coming, and now is (at least under certain circumstances), when manufacturers are to be held responsible to those damaged by reliance on their false and misleading advertising, even though there be no privity of contract. See *Freeman v. Ric-Wil Co.* (1955), 47 Wn. (2d) 760, 289 P. (2d) 1015; *Dobbin v. Pacific Coast Coal Co.* (1946), 25 Wn. (2d) 190, 170 P. (2d) 642; *Baxter v. Ford Motor Co.* (1932), 168 Wash. 456, 12 P. (2d) 409, 15 P. (2d) 1118, 88 A. L. R. 521.

But these are damage, and not recission, cases, and do not reach the issue which we are raising here as to the right of the plaintiff to seek the return of the purchase price from the manufacturer on the theory of the rescission of a contract of sale, the contract being with the dealer and not with the manufacturer. The solution is obviously not a claim for rescission against the dealer, and an action for damages for fraud against the manufacturer, inasmuch as we have held that a plaintiff cannot repudiate the contract as to one defendant and affirm it as to another. *Reilly v. Hopkins* (1925), 133 Wash. 421, 234 Pac. 13; *Hager v. Scott* (1923), 125 Wash. 635, 216 Pac. 840. If there is a petition for rehearing (and this is not an invitation), the plaintiff should meet this issue.

The other question raised by the court *sua sponte*, should, likewise, receive consideration in such a petition if filed. It rests upon the assumption that the plaintiff might be en-

titled to relief against the manufacturer on the theory of damages for fraud, even though he had waived his right, if any, to rescind. Should the court be persuaded to adopt such a view, what damages could the jury have found to be established against the manufacturer? For the benefit of counsel, we suggest the basis of the court's concern on the question just stated.

The return of the purchase price is not a proper measure of damage, for the five-thousand-dollar harvester was not valueless for any purpose—even the plaintiff conceded it did a "fairly good job" in alfalfa. No attempt was made to come under the benefit of the bargain rule, generally recognized as applicable in such cases, *i.e.*, the measure of damages is the difference between the value of the property, had it been as represented, and its actual value. *Scroggin v. Worthy* (1957), 51 Wn. (2d) 119, 316 P. (2d) 480. Nor was there an attempt to prove special damages such as the additional cost of using the neighbor's equipment for the 1953 harvest. The only evidence as to special damages was as to the cost to the plaintiff of repairs, in an effort to make the harvester function satisfactorily. This was the sum of the items in exhibit No. 3, *i.e.*, $139.80.

This statement of issues raised by the court, as well as the consideration of those raised by the parties to the appeal, is a somewhat unusual procedure; but, as indicated, the court would not reverse the judgment of dismissal unless the plaintiff could satisfy it that he had a right to maintain an action for rescission against the manufacturer (entirely apart from the issue of waiver); and if it is contended that the plaintiff was entitled to recover on some other theory, the damages believed to have been established should be indicated.

For the specific reason that the plaintiff had waived his right to rescind the contract for the harvester, if he had such a right, the judgment of dismissal entered by the trial court is affirmed.

WEAVER, C. J., FINLEY, ROSELLINI, and FOSTER, JJ., concur.

---

August 19, 1960. Petition for rehearing denied.