[No. 1598-2.   Division Two.   May 3, 1976.]

CLOVER PARK SCHOOL DISTRICT No. 400, *Respondent*, v. CONSOLIDATED DAIRY PRODUCTS COMPANY, *Appellant*.

*James L. Magee* and *Betty Ruddy* (of *MacBride, Sax & MacIver*), for appellant.

*Donald F. Herron, Prosecuting Attorney,* and *Roger Miener, Deputy,* for respondent.

REED, J.—Consolidated Dairy Products Company (Darigold) appeals from an order awarding a summary judgment of damages for breach of a contract to supply milk to Clover Park School District No. 400 (Clover Park), and denying Darigold's own motion for summary judgment of dismissal. The issue is whether a contract was formed between the parties and, if so, whether Darigold is entitled to rescission thereof because of an error in submitting its bid. We affirm the trial court's decision finding Darigold liable for breach of contract.

Clover Park sent invitations to several dairies, including Darigold, to secure bids for dairy products for the 1973-74 school year. Bids were to be opened May 25, 1973, at 10 a.m., and the invitation provided that "no bidder may withdraw his bid after the time set for opening unless the award of contract is delayed . . ." Among the products for which bids were sought was milk in an estimated amount of 1,490,118 half pints.

The litigation is traceable to an inadvertent, human error in the office of Richard Izzard, Darigold's Farms Division general manager. His usually reliable secretary saw penciled figures on a bid form in the Clover Park bid file and, assuming they were Darigold's bid, typed the price of $.07013 per half pint on the form subsequently submitted. In reality, the figure she typed represented the previous year's price rather than the intended 1973-74 bid of $.079 per half pint. Mr. Izzard would have reviewed the bid figures but was away from the office; the erroneous bid was submitted and proved to be lowest among five bids opened by Clover Park.

Darigold's Tacoma area manager was on hand for the bid opening and immediately recognized the error. On the same day, May 25, he notified Clover Park of the mistake. Also on May 25, Mr. Izzard wrote to Clover Park to request that the bid be rejected.

Clover Park responded on May 30 through Edmund Roberts, its buyer, who told Mr. Izzard that

all I can do is to assure you that this matter will be presented to the Board of Directors together with your letter and any additional information that you might wish to present. The Board of Directors will then make the final decision as to whether or not your bid may be withdrawn.

Darigold sent no documentation of the clerical error or other material to Clover Park, nor did Darigold appear at the June 11, 1973, school board meeting at which the bid was formally accepted. Darigold was notified of the bid's acceptance in a letter from Mr. Roberts dated June 12, 1973.

This prompted a letter from Darigold's counsel on June 14, in which he advised that Darigold "cannot supply" the milk at the erroneous price and that it "would be harsh and inequitable" and contrary to "the law of the state" for Clover Park to insist on performance. Counsel also said:

After the mistaken bid was publicly disclosed Foremost Dairies contacted our client and indicated that they would be willing to serve you at the lower quoted price [presumably $.07013]. If you could contact them about this it would seem that any problems would have been resolved.

However, Foremost changed its mind about supplying milk at the lower price. Into the void next stepped Sanitary Cloverleaf Dairy to supply milk to Clover Park beginning September 1, 1973; apparently this substitution of supply was obtained by Darigold and was acceptable to Clover Park. The arrangement went smoothly until about the middle of October, when Sanitary Cloverleaf ceased operations because of insolvency.

On October 16, Mr. Izzard informed Clover Park of Sani-

tary Cloverleaf's difficulties and stated his latest position in these terms:

> As you know, Darigold (Consolidated Dairy Products Company) submitted an erroneous bid of $.07013 per half pint for homogenized milk earlier this year which was called to your attention immediately. The error was due to a clerical mistake in the office which we would be happy to document by affidavit or any other method you suggest. To avoid a controversy at that time, we were able to find another supplier who would provide milk at the erroneously bid price.
>
> Darigold cannot supply milk at the price erroneously quoted but will supply milk at its correct price of $.079 in the interim while you decide whether to rebid the contract or take the milk at the correct price until the end of the school year.

Then on November 8, 1973, counsel for Darigold advised the deputy prosecutor representing Clover Park that he believed the law supported Darigold; that deliveries were continuing without prejudice to its position pending resolution of the matter; that Darigold wished to maintain a good relationship with the school district; but that Darigold was unfairly losing money due to Clover Park's position that the clerical error was binding.

The prosecutor's opinion in reply was essentially that Clover Park was entitled to hold Darigold to the bid it submitted. On December 6, 1973, Darigold informed Clover Park it would cease deliveries of milk, but in accord with its desire to maintain good will with the school district, deliveries would continue until the end of December so that Clover Park would have time to rebid the contract.

Clover Park's motion for summary judgment included the averment that obtaining milk to satisfy its needs for the remainder of the school year would cost the district $11,466.70 more than it would have paid Darigold at the bid price of $.07013 per half pint. Darigold's countering motion for dismissal and affidavit stated it would have lost $9,983 by performing the contract for the school year at the mistaken bid price had the cost of milk remained as predicted,

and would in fact have lost $25,389.60 by performing at the erroneous price because of sharp increases in the cost of milk.

Judgment was awarded for $11,466.70 plus costs, Darigold's motion for dismissal was denied, and this appeal followed.

We begin with the premise that a bid is no more than an offer to contract. *Mottner v. Mercer Island*, 75 Wn.2d 575, 452 P.2d 750 (1969). Clover Park's advertisement for bids provided that no bid could be withdrawn after the time for opening. Once the bid was submitted, its acceptance by the school district formed a contract. 3 A. Corbin, *Corbin on Contracts* § 609, at 678-79 (1960). However, the general rule is that communication of the error in computation by Darigold before Clover Park could change its position in reliance on the bid, rendered the contract voidable by rescission. 3 A. Corbin, *Corbin on Contracts* § 609, at 680-82.

The propriety of relief from a contract when a mistaken bid calculation is promptly made known to the offeree is discussed in *Donaldson v. Abraham*, 68 Wash. 208, 122 P. 1003 (1912) and *Puget Sound Painters, Inc. v. State*, 45 Wn.2d 819, 278 P.2d 302 (1954). In those cases, erroneously computed bids were submitted to governmental entities along with mandatory bid bonds, and the error in each case was immediately made known to the offeree. The bidder in each case was successful in preventing forfeiture of its bid bond.

In *Puget Sound Painters, Inc. v. State, supra*, the court set forth guidelines as to when forfeiture of a bid bond should be enjoined—and by clear inference, when a bid contract can be rescinded—where a unilateral and material mistake is made in the offeror's bid and the error is called to the attention of the offeree before he has changed his position in reliance thereon. Under these guidelines relief will be decreed:

(a) if the bidder acted in good faith, and (b) without gross negligence, (c) if he was reasonably prompt in

giving notice of the error in the bid to the other party, (d) if the bidder will suffer substantial detriment by forfeiture, and (e) if the other party's status has not greatly changed, and relief from forfeiture will work no substantial hardship on him.

*Puget Sound Painters, Inc. v. State, supra* at 823.

We are convinced the criteria justifying rescission were initially met in this case, for Darigold acted in apparent good faith and without gross negligence; it promptly gave notice of the error; it stood to suffer substantial detriment by virtue of the error; and Clover Park had not irrevocably acted in reliance when notice was given, *i.e.*, the bid could have been awarded to someone else, at relatively low additional cost.[1] Ordinarily, the offeree who has reason to know of a unilateral mistake will not be permitted to "snap up" such an offer and profit thereby. 3 A Corbin, *Corbin on Contracts* § 609, at 680; *Puget Sound Nat'l Bank v. Selivanoff*, 9 Wn. App. 676, 514 P.2d 175 (1973).

However, rescission of an agreement once made must be prompt upon discovery of the facts warranting such an action. *Bayley v. Lewis*, 39 Wn.2d 464, 236 P.2d 350 (1951). When a party fails to take steps to rescind within a reasonable time and instead follows a course of conduct inconsistent therewith, the conclusion follows that he has waived his right of rescission and chosen to continue the contract. *Fines v. West Side Implement Co.*, 56 Wn.2d 304, 352 P.2d 1018 (1960); *Coovert v. Ingwersen*, 37 Wn.2d 797, 226 P.2d 187 (1951); *Prager's, Inc. v. Bullitt Co.*, 1 Wn. App. 575, 463 P.2d 217 (1969); *see* 5 S. Williston, *A Treatise on Law of Contracts* § 688 (3d ed. 1961).

At this point we wish to parenthetically state our view that sound public policy requires us to closely scrutinize a bidder's contention that it intended to rescind its bid on a contract with an agency of government. It should be difficult for low bidders to claim an error in computation as the basis for escaping from a bid noticeably lower than the

---

[1]The second low bid was $.072, which would have cost Clover Park $2,379.08 more than the $.07013 bid. The third bid, $.0748, would have cost $5,941.29 more.

competition's. This is the "bad faith" element of the test quoted above. *Puget Sound Painters, Inc. v. State, supra* at 822. Having stated this general concern, however, we hasten to add there is absolutely no reason to infer that Darigold's bid in this case was the product of anything but clerical error.

■ Unfortunately for Darigold, its conduct now urged as consistent with an intent to rescind the milk contract, manifested instead an attempt to perform. Although the letters of May 25 and June 14 evince an intent to rescind, in the next breath the June 14 letter states that Foremost could substitute performance at the lower price. This can be interpreted, as Clover Park argues, as Darigold's agreement to allow performance by a designated substitute. Such an ambiguous statement alone does not, of course, determine the matter, because waiver of a right will not be inferred from doubtful factors, and there must be evidence of an intent to relinquish the right. *Bonanza Real Estate, Inc. v. Crouch,* 10 Wn. App. 380, 517 P.2d 1371 (1974). However, the theory of rescission in this case is negated— and the conclusion the contract was continued is supported —by subsequent events.

Rather than firmly and unequivocally sticking to its initial resolve to refuse to perform and to "avoid a controversy at that time" Darigold, according to Mr. Izzard's October 16 letter, was "able to find another supplier [besides Foremost] who would provide milk at the erroneously bid price." Thus, it clearly appears that Darigold was willing to allow Sanitary Cloverleaf to supply the milk at the erroneous bid price for the entire term of the contract. It was not until Sanitary Cloverleaf's insolvency in mid-October that Darigold uttered one further word in repudiation of the agreement and sought to fall back on its intended bid of $.079. Darigold obviously and perhaps understandably chose to permit fulfillment of its performance by another company so as to preserve a harmonious relationship with Clover Park. Having elected that course, Darigold cannot, however, now claim it always and invariably was in a posture of rescission. *See Red-Samm Mining Co. v. Port of*

*Seattle,* 8 Wn. App. 610, 508 P.2d 175 (1973) involving an equitable action for reformation of a bid contract, based on an erroneous calculation, which was nevertheless performed by the bidder. In dismissing the complaint, the court cogently remarked at page 616:

> Red-Samm cannot have its cake and eat it too. It elected to accept and perform the contract rather than chance that equity might *not* deny the port the right to forfeit Red-Samm's bid bond.

Although Clover Park did "snap up" Darigold's low bid at first, Darigold by its conduct acquiesced in this after other suppliers appeared and allowed Clover Park to change its position by leading the school district to rely on the belief it did not need to select one of the other bids while time remained to do so. In the end, Clover Park incurred the detriment of extra costs upon rebidding that would have been largely avoided had Darigold forced Clover Park to select another of the original bids. We are persuaded the trial court was correct in finding no genuine issue of material fact as to Darigold's conduct being inconsistent with rescission and demonstrating an intent to permit the contract to stand.

Finally, Darigold argues in its reply brief that the issue of waiver of a right to rescind and the theory of Clover Park's reliance on Darigold's apparent abandonment of rescission, are both "affirmative matters" that should have been pleaded by Clover Park in order for the trial court and this court even to consider them. The short answer to this is while CR 8(c) does establish a duty to plead waiver and other matters "with certainty and particularity," *Bonanza Real Estate, Inc. v. Crouch, supra* at 386, the rule applies only to affirmative *defenses.* Here Clover Park was the plaintiff and cannot be expected to plead matters in anticipation of their being raised affirmatively by the defendant. The rule does not allow for such a construction.

Judgment affirmed.

PETRIE, C.J., and PEARSON, J., concur.

Petition for rehearing denied June 17, 1976.

Review denied by Supreme Court October 19, 1976.